IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIDLAND STATE BANK, as guardian
of the minor children and independent
administrator of the Estate of JULIA
CASTELLANOS, deceased,

        Plaintiff,

    v.

UNITED STATES OF AMERICA and
DOMINGO I. OSUNERO, JR., M.D.

        Defendants.

No. 18-cv-02775
Judge Franklin U. Valderrama

MEMORANDUM OPINION AND ORDER

Julia Castellanos (Castellanos) tragically passed away on November 19, 2015

following an incorrect intubation during an emergency Cesarean section operation at

Mount Sinai Hospital. Plaintiff Midland State Bank (Midland), as guardian of

Castellanos' minor children and independent administrator of her estate, filed this

wrongful death and survival action against the United States of America (USA) and

Dr. Domingo I. Osunero, Jr., M.D. (Dr. Osunero) pursuant to the Federal Tort Claims

Act, 28 U.S.C. § 2671, *et seq*., the Illinois Wrongful Death Act, the Illinois Survival

Act, and Illinois common law. R. 30, Am. Compl.[1] Midland alleges that Dr. Osunero,

the attending on-call anesthesiologist, was negligent in supervising the Anesthesia

Care Team and in rendering medical treatment to Castellanos. Dr. Osunero's motion

---

[1] Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

for summary judgment is before the Court. R. 60, Mot. Summ. J. For the reasons set forth below, Dr. Osunero's motion for summary judgment is denied.

## Background

The following facts are set forth as favorably to Midland, the non-movant, as the record and Local Rule 56.1 permit. *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). This background section details all material undisputed facts and notes where facts are disputed. At summary judgment, the Court assumes the truth of the undisputed facts, but does not vouch for them. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

On November 16, 2015, Castellanos presented to Mount Sinai Hospital at 38 weeks gestation with complaints of vaginal bleeding and contractions. R. 71, Pl.'s Am. Resp. DSOF ¶ 10.[2] Dr. Lemuel Shaffer (Dr. Shaffer), Castellanos' OB/GYN, conducted an initial evaluation and noted fetal bradycardia and vaginal bleeding. *Id*. ¶ 11; *see also* R. 61, Mot. Summ. J. Exhs., Exh. D, Sood Dep. at 42:7–16 (explaining that the term, "fetal bradycardia," refers to a baby's heart rate holding at a sustained low). At approximately 7:55 p.m., Dr. Shaffer elected to proceed with an emergent Cesarean section based on his concern for a placental abruption. Pl.'s Am. Resp. DSOF ¶ 13; *see also* Sood Dep. at 54:21–57:1 (explaining that the term, "placental abruption," refers

---

[2]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for Defendant's Statement of Facts (R. 60-1); "Pl.'s Am. Resp. DSOF" for Plaintiff's Amended Response to Defendant's Statement of Facts (R. 71); "PSOF" for Plaintiff's Statement of Additional Facts (R. 69); and "Def.'s Resp. PSOF" for Defendant's Response to Plaintiff's Statement of Additional Facts (R. 73).

to a premature separation of the placenta that can cause bleeding and can deprive a baby from oxygen). Following Dr. Shaffer's decision to proceed with an emergent Cesarean section surgery, CNRA Mary Kammann, a nurse anesthetist (Kammann), was paged to assist with Castellanos' surgery. *Id.* ¶ 14.

Dr. Osunero was the on-call attending anesthesiologist at Mount Sinai Hospital that evening. Pl.'s Am. Resp. DSOF ¶ 12; R. 73, Def.'s Resp. PSOF ¶ 13. At that time, Dr. Osunero was a compensated employee of Sinai Medical Group. R. 61, Mot. Summ. J. Exhs., Exh. D, Osunero Dep. at 19:10–20:13. Crucially, and explored in greater detail below (*see infra*, at 11–21), the parties dispute when Dr. Osunero became involved in Castellanos' case. Pl.'s Am. Resp. DSOF ¶ 15–16. The parties specifically dispute whether Dr. Osunero was informed of the decision to proceed by Cesarean section before anesthesia was induced and whether he participated in the "anesthesiology preoperative assessment" before anesthesia was induced. *Id.*

Midland, pointing to the Anesthesiology Preoperative Evaluation form (*see* PSOF, Exh. 3, Anesthesiology Preoperative Evaluation Form (detailing Castellanos' preoperative diagnosis, identifying information, vitals, and the type of anesthetic plan being administered)), notes that Dr. Osunero's signature appears on the bottom right-hand corner of the form with a date ("11/16/2015") and a time ("20:00" or 8:00 p.m.). Pl.'s Am. Resp. DSOF ¶¶ 15–16. Midland contends that this form indicates that Dr. Osunero was informed of the emergent Cesarean section decision and completed the Anesthesiology Preoperative Evaluation Form for Castellanos at 8:00 p.m. *Id.* Dr. Osunero disagrees, testifying that he was first paged about Castellanos and her

3

surgery at 8:36 p.m., and he was not involved in Castellanos' case or care before that time. Def.'s Resp. PSOF ¶ 8; Osunero Dep. at 142:16–147:18. When questioned about his signature and the inclusion of the 8:00 p.m. timestamp on the Anesthesiology Preoperative Evaluation Form, Dr. Osunero testified that he signed the Anesthesiology Preoperative Evaluation Form *after* the surgery had concluded (but does not recall the exact time), and "the time [he] put – put [on the form] was the time that [his] CRNA examined [Castellanos], so it just went along with that." Osunero Dep. at 144:2–14.

Addressing these discrepancies later, the parties do agree that Kammann intubated Castellanos to administer general anesthesia, and Dr. Osunero was not present during the intubation. Pl.'s Am. Resp. DSOF ¶¶ 17, 19. Kammann placed the endotracheal tube in Castellanos' esophagus (a complication called an esophageal intubation), which prevented Castellanos from receiving adequate oxygenation or adequate ventilation. *Id.* ¶ 27. Dr. Shaffer delivered Castellanos' infant at approximately 8:10 p.m. *Id.* ¶ 20. Shortly thereafter, Dr. Shaffer and the care team addressed Castellanos' uterine atony. *Id.* ¶ 21; *see also* R. 61, Mot. Summ. J. Exhs., Exh. D, Shaffer Dep. at 65:19–66:6 (explaining that the term, "uterine atony," refers to a postpartum hemorrhage that occurs when the uterus fails to contract).

Dr. Osunero received a page at 8:36 p.m. that requested his presence in the operating room. Pl.'s Am. Resp. DSOF ¶ 24. After receiving the page at 8:36 p.m., Dr. Osunero testified that he went directly to the Labor and Delivery Department operating room. *Id*. ¶ 26; Def.'s Resp. PSOF ¶ 17. Dr. Osunero testified that it took

4

him approximately three minutes to arrive at the operating room after receiving the page, but he does not recall the exact time of his arrival. Pl.'s Am. Resp. DSOF ¶ 26; Def.'s Resp. PSOF ¶ 17.

Upon arrival, Dr. Osunero observed the anesthesia monitor and saw that Castellanos' heart rate was zero, and the capnograph wave was a straight line. Def.'s Resp. PSOF ¶ 17. Dr. Osunero turned off the ventilator, tried to "handbag" the patient, and suspected an esophageal intubation. *Id*.; Pl.'s Am. Resp. DSOF ¶ 28. Dr. Osunero grabbed the laryngoscope and performed a laryngoscopy, confirming an esophageal intubation. Def.'s Resp. PSOF ¶ 17. Dr. Osunero pulled out the existing endotracheal tube and successfully reintubated Castellanos. Pl.'s Am. Resp. DSOF ¶ 29. Dr. Osunero testified that it took approximately one to two minutes from the time he entered the operating room to verify the incorrect placement of the endotracheal tube and effectively obtain a tracheal intubation. Def.'s Resp. PSOF ¶ 17. Dr. Osunero testified that he initiated a Code Blue and stated that he believes he called the Code Blue also approximately one to two minutes after entering the operating room. *Id*. Importantly, and as explained further by Midland's anesthesiology expert, Midland disputes the exact time Dr. Osunero successfully reintubated Castellanos. Pl.'s Am. Resp. DSOF ¶ 29. Midland also disputes the exact time Dr. Osunero initiated the Code. *Id*. Midland points to the Code Blue Sheet ("Code Sheet") and notes that the Code Sheet includes "20:30" (8:30 p.m.) as the time the Code was called. Def.'s Resp. PSOF ¶ 28.

Following the initiation of the Code, Dr. Kunal Patel (a pulmonologist and critical care physician) and the Code Team took over management of Castellanos. Pl.'s Am. Resp. DSOF ¶ 30. The Code Team resuscitated Castellanos. *Id*. ¶ 31. After the Code was concluded, Dr. Osunero took photographs (*see* PSOF, Exh. 6, Osunero Photographs) of his pager showing the 8:36 p.m. page, the minute-by-minute trends showing the vital statistics of Castellanos as recorded on the anesthesia monitor starting at 8:02 p.m. until 9:16 p.m.[3], and the writing on the white board hanging in the operating room. Def.'s Resp. PSOF ¶ 18. Dr. Osunero did not "interrogate" his pager after the Code was concluded, other than noting that he did not receive any pages prior to 8:36 p.m. *Id*. ¶ 19.[4] On November 19, 2015, three days after the operation and delivery, Castellanos passed away. Pl.'s Am. Resp. DSOF ¶ 32.

John Downs, M.D. (Dr. Downs), an anesthesiology expert, provided expert testimony for Midland. PSOF ¶ 23. Dr. Downs first opined that a patient-physician relationship existed between Dr. Osunero and Castellanos. PSOF ¶ 11. Dr. Downs testified that certain hospital records—including a consent for operative/invasive and

---

[3]Midland explains that the military time shown at the bottom of each photograph reflecting "21:00 hours" is incorrect by one hour due to the failure of Mount Sinai Hospital to change the time on the anesthesia monitor after daylight savings. PSOF ¶ 18, n.1. The photographs show vital statistics from "21:02" to "22:16," but it is undisputed that those times should instead read "20:02" to "21:16." *Id*.

[4]Midland disputes the contention that the 8:36 p.m. page was the only page Dr. Osunero received regarding Castellanos' care. Pl.'s Am. Resp. DSOF ¶¶ 15–16. Midland contends that because Dr. Osunero, Mount Sinai Hospital, and Sinai Medical Group failed to preserve the data on Dr. Osunero's pager in an effort to show that no pages were sent to Dr. Osunero before 8:36 p.m., an adverse inference can be drawn therefrom. *Id*. Notably, while Midland questions Dr. Osunero's pager records, it does not reference an adverse inference with regard to the pager in arguing that the patient-physician relationship began prior to 8:36 p.m. Resp. at 10. Instead, and as discussed further below, Midland relies on documents to establish an earlier patient-physician relationship. *Id*.

other medical procedures (*see* PSOF, Exh. 2, Consent), an anesthesiology preoperative evaluation form (*see* Anesthesiology Preoperative Evaluation Form), and a billing record (*see* PSOF, Exh. 4, Billing Record)—"are typically used by doctors to establish a physician-patient relationship." PSOF ¶ 8–11.

Dr. Downs next opined that Dr. Osunero, as the only on-call attending anesthesiologist, deviated from the standard of care required of supervising attendings by: failing to contact Kammann at the beginning of his shift; failing to assess Castellanos and formulate an anesthesia care plan prior to the procedure; failing to be present for the induction of anesthesia and major portions of the operation; and failing to supervise or medically direct Kammann during the procedure. Osunero Mot. Summ. J. Exhs., Exh. J, Downs Report at 2–3; *see also* Downs Dep. at 164:16–165:14.

Finally, based upon his review of the Osunero Photographs, Dr. Downs further testified that Dr. Osunero's estimated timing of when he successfully reintubated Castellanos was incorrect by a margin of as much as seven minutes. PSOF ¶ 23. Dr. Downs stated that the vital signs values shown in the photographs for the period 8:40 p.m. to 8:47 p.m. demonstrated that the endotracheal tube incorrectly remained in Castellano's esophagus during those seven minutes. *Id*. Dr. Downs further stated that there is a gap in the photographic evidence taken by Dr. Osunero between 8:47 p.m. and 8:50 p.m., and only at 8:50 p.m. do the vital sign values show the endotracheal tube in the correct position. *Id*. Based on this photographic evidence, Dr. Downs opined that the reintubation did not take place at 8:40 p.m. or 8:41 p.m. (as stated in

Dr. Osunero's testimony), but rather would not have taken place until sometime after 8:47 p.m. and before 8:50 p.m. *Id*. Dr. Downs concluded that this "delay in reintubation was a departure from the standard of care," and "this departure bore a direct causal relationship to the injuries suffered by Julia Castellanos and her ultimate death." *Id*. ¶ 24 (citing Osunero Mot. Summ. J. Exhs., Exh. I, Downs Dep. at 174:15–175:12). Dr. Downs described the causes of Castellanos' death as ". . . cardiac arrest secondary to severe arterial hypoxemia, and then due to the delay in resuscitation, irreversible and severe brain injury, all of which led to coagulopathy, renal failure, liver failure, multi-system organ failure, and ultimately death." PSOF ¶ 25 (citing Downs Dep. at 175:14–22).[5]

## Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for

---

[5]While Dr, Osunero admits that Dr. Downs offered opinion testimony, he generally denies that Dr. Downs' opinions constitute facts. *See generally* Def.'s Resp. PSOF.

the nonmoving party." *Anderson*, 477 U.S. at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

## Analysis

Midland seeks to recover damages for Castellanos' pain, suffering, and death caused by Dr. Osunero's alleged medical negligence under the Illinois Wrongful Death Act and the Illinois Survival Act. Am. Compl. ¶¶ 49–61 (Counts III and IV). The Illinois Wrongful Death Act states, "[w]henever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof." 740 ILCS 180/1. The Illinois Survival Act provides for a derivative action allowing "a representative of the decedent to maintain those statutory or common law actions which had already accrued to the decedent before he died." *Kmak v. Sorin Grp. Deutschland GmbH*, 2017 WL 8199974, at *3 (N.D. Ill. Dec. 12, 2017); *see* 735 ILCS 5/27-6. Dr. Osunero contends (and Midland does not dispute) that because both the Wrongful Death Act claim and the Survival Act claim are premised on allegations of medical negligence, Midland must prove the four elements of medical negligence to prevail against Dr. Osunero. R. 60-2, Mot.

Summ J. Memo. at 3. Specifically, Midland must prove that: (1) Dr. Osunero owed a duty of care to Castellanos; (2) Dr. Osunero breached that duty; and (3) injury and damages resulted from that breach. *Siwa v. Koch*, 902 N.E.2d 1173, 1176 (Ill. App. Ct. 2009).

As noted above, Midland retained Dr. Downs as its medical expert witness. Dr. Downs has opined that Dr. Osunero deviated from the standard of care in his supervision and treatment of Castellanos. *See* R. 70, Resp. at 7. Dr. Osunero's summary judgment motion classifies Dr. Downs' opinions into two temporal categories—(i) criticisms of Dr. Osunero's conduct before 8:36 p.m. and (ii) criticisms of Dr. Osunero's conduct after 8:36 p.m. Mot. Summ J. Memo. at 2. Dr. Osunero uses 8:36 p.m. as the pertinent divider because, per his testimony, he was first paged regarding Castellanos at that time. *Id.* Dr. Osunero argues that with each category of conduct, Midland cannot establish an essential element of the medical negligence claim, and as such, summary judgment should be granted in his favor. *Id.*

First, Dr. Osunero maintains that he cannot be held liable for medical negligence related to his conduct prior to 8:36 p.m., because Midland cannot establish that Dr. Osunero owed a duty of care (the first element of a medical negligence claim) to Castellanos before he was paged to treat her. Mot. Summ. J. Memo. at 2. Second, Dr. Osunero asserts that he also cannot be held liable for medical negligence related to his conduct after 8:36 p.m., because Midland cannot establish that his treatment of Castellanos after his arrival in the operating room caused or contributed to cause

10

Castellanos' injuries and ultimate death (the third element of a medical negligence claim). *Id.* The Court addresses each of these arguments in turn.

## I.     Whether Dr. Osunero Owed a Duty of Care Prior to 8:36 p.m.

Dr. Downs opined that Dr. Osunero, as the only on-call attending anesthesiologist, deviated from the standard of care by: (i) failing to contact Kammann at the beginning of his shift; (ii) failing to assess Castellanos and formulate an anesthesia care plan prior to the procedure; (iii) failing to be present for the induction of anesthesia and major portions of the operation; (iv) and failing to supervise Kammann during the case. Mot. Summ. J. Memo. at 4 (citing Osunero Mot. Summ. J. Exhs., Exh. J, Downs Report at 2–3). Noting that these criticisms refer to conduct pre-8:36 p.m., Dr. Osunero argues that summary judgment is proper, because Midland can prove no set of facts supporting the existence of a physician-patient relationship between Dr. Osunero and Castellanos before he was first paged about her case. Mot. Summ. J. Memo. at 3.

Dr. Osunero correctly explains that under Illinois law, a physician's duty arises (i) when a physician-patient relationship has been expressly established, or (ii) when a special relationship exists. Mot. Summ J. Memo. at 3 (citing *Siwa*, 902 N.E.2d at 1176). An express physician-patient relationship is a consensual relationship, established when a patient seeks the physician's medical care, and the physician knowingly accepts the person as a patient. *Id.* (citing *Reynolds v. Decatur Mem'l Hosp.*, 660 N.E.2d 235, 239 (Ill. App. Ct. 1996)). A special relationship, on the other hand, may exist without any meeting between the physician and the patient. *Id.*

(citing *Mackey v. Sarroca*, 35 N.E.3d 631, 638 (Ill. App. Ct. 2015)). But a special relationship exists only where the physician takes some affirmative action to participate in the care, evaluation, diagnosis, or treatment of a specific patient. *Id.* at 4 (citing *Mackey*, 35 N.E.3d at 638). "The central inquiry is whether the physician *has been asked* to provide a specific service for the benefit of a specific patient." *Mackey*, 35 N.E.3d at 638 (emphasis added).

Dr. Osunero, focusing only on the special relationship inquiry, contends that he was not asked to provide a specific service for Castellanos' benefit before 8:36 p.m., and as such, did not owe her a duty of care before that time. Mot. Summ J. Memo. at 4. Dr. Osunero notes (and the Court agrees) that *Mackey* is instructive to understand the applicable standard. In *Mackey*, a patient was transported to the hospital emergency department complaining of severe abdominal pain. 35 N.E.3d at 633. Per hospital protocol, the emergency room physician paged the defendant, the "on-call" attending urologist, after test results revealed a urinary tract infection and kidney stone. *Id.* at 634. Over the phone, the urologist obtained a detailed description of the patient's condition and the results of diagnostic tests; took notes on the conversation; and recommended that the patient be prescribed a medication and discharged with the instruction to seek an out-patient follow-up appointment. *Id.* After discharge, the patient developed severe septic shock and died. *Id.* The trial court granted the defendant-urologist's motion to dismiss, finding that, as the on-call urologist, he owed no duty of care to the decedent, because a physician-patient relationship had not been established. *Id.* at 636.

The Illinois Appellate Court reversed, finding that the on-call urologist and the decedent had a special relationship, giving rise to a duty of care. *Mackey*, 35 N.E.3d at 640. In making that determination, the court examined four Illinois cases on the physician-patient special relationship—*Weiss v. Rush N. Shore Med. Ctr.,* 865 N.E.2d 555 (Ill. App. Ct. 2007); *Lenahan v. Univ. of Chi.,* 808 N.E.2d 1078 (Ill. App. Ct. 2004); *Bovara v. St. Francis Hosp.,* 700 N.E.2d 143 (Ill. App. Ct. 1998); and *Reynolds,* 660 N.E.2d at 235. The court noted that *Lenahan* and *Bovara* stand for the proposition that "a special relationship establishing a physician-patient relationship exists where […] the consulting physician is assigned the task of consulting as part of established procedures, protocols or contractual obligation with the hospital, is compensated for those consulting services, orders tests or reviews test results, gives specific medical advice regarding contemporaneous patient care, and makes decisions regarding the patient's current medical care." *Mackey*, 35 N.E.3d at 640 (citing *Lenahan,* 808 N.E.2d at 1086; *Bovara,* 700 N.E.2d at 148–49). Whereas, *Weiss* and *Reynolds* stand for the proposition that where "a physician is consulted or advice is sought on an informal basis, where no compensation is received by the consulting physician, the consulting physician does not order tests or review test results, and has no input in the actual treatment of the patient, no special relationship creating a physician-patient relationship has been established." *Mackey*, 35 N.E.3d at 640 (citing *Weiss,* 865 N.E.2d at 557; *Reynolds,* 660 N.E.2d at 239). Reviewing the totality of the facts—including that the on-call urologist (i) was assigned to consult with treating physicians pursuant to a contract; (ii) was compensated for his consulting services;

(iii) was consulted by the emergency room for the patient's benefit for the specific purpose of rendering diagnostic and medical advice regarding her treatment; (iv) received specific information regarding her history, symptoms, and diagnostic test results; (v) evaluated those tests and formed a medical opinion; (vi) was actually responsible for making a decision regarding her care and whether she should be admitted or discharged; and (vii) decided that the patient could be discharged and relayed that recommendation to the emergency physician—the court found the on-call urologist and decedent's relationship to be closer to that of the special relationship found in *Lenahan* and *Bovara*. *Id.*

Here, Dr. Osunero was the on-call anesthesiologist pursuant to a contract at Mount Sinai Hospital and was compensated for his services. *See* Osunero Dep. at 19:10–20:13. Dr. Osunero, however, insists that the other *Mackey* factors are absent, as he was not contacted for Castellanos' benefit; did not receive specific information regarding her case; did not evaluate her diagnostic tests; did not form a medical opinion regarding her care; was not responsible for making a decision regarding her care; and did not make a decision regarding her care at any time before 8:36 p.m. Mot. Summ. J. Memo. at 5 (*Mackey*, 35 N.E.3d at 640). Overall, Dr. Osunero contends that under Illinois law, he must have been contacted and made aware of a request for his services regarding a specific patient, and then must take some affirmative action to participate in the patient's care before he can be held to owe a duty. Mot. Summ. J. Memo. at 7.

In response, Midland maintains that Dr. Osunero *did* owe Castellanos a duty of care before 8:36 p.m. Resp. at 8. Without citing to any case law, Midland first insists that Dr. Osunero and Castellanos had an express patient-physician relationship, because Dr. Downs testified that certain hospital records related to Castellanos— including a consent for operative/invasive and other medical procedures (*see* Consent), an anesthesiology preoperative evaluation form (*see* Anesthesiology Preoperative Evaluation Form), and a billing record (*see* Billing Record)—"are typically used by doctors to establish a physician-patient relationship." Resp. at 8 (PSOF ¶ 11). The Court disagrees. Illinois courts are clear that the question of whether a physician owed a patient a duty of care is one of law for the court and not a question of medicine. *See Reynolds*, 660 N.E.2d at 239. *McIntyre v. Balagani*, 2020 WL 7232097, at *1 (Ill. App. Ct. Dec. 7, 2020) is clear: "Plaintiffs may not, in the guise of offering expert medical opinion, arrogate to themselves a judicial function and obviate a ruling on the existence of or extent of a legal duty which might be owed by a physician to a patient." As such, Dr. Down's opinion may not be relied upon in determining the existence of an express duty here. Further, based this time on its own evaluation, the Court finds that without any direct contact between Dr. Osunero and Castellanos, Midland cannot establish an express patient-physician relationship. *See Reynolds*, 277 Ill. App. 3d at 85.

This leaves the special relationship analysis. In alternatively arguing that a special (or as Midland calls it, an implied) relationship existed before 8:36 p.m., Midland first relies on an Illinois statute (210 ILCS 85/10.7(4)(B)), hospital policies

and procedures related to anesthesia, Dr. Downs' testimony (again), and out-of-state cases[6] to support the contention that as the on-call attending anesthesiologist, Dr. Osunero had a "responsibility" to supervise the anesthesia services being rendered at Mount Sinai Hospital. *See* Resp. at 10–15. The Court finds this argument and supporting authority wholly unpersuasive. Midland does not cite (nor has the Court identified) any Illinois case that finds the existence of a special relationship based on a state statute or a hospital policy. Nor does the Court find Dr. Downs' opinions regarding the patient-physician relationship and the out-of-state cases useful in determining whether a patient-physician relationship has been established under Illinois law.

However, the Court does find Midland's secondary argument compelling. Quoting *Mackey* ("a physician-patient relationship is established where the physician takes **some affirmative action** to participate in the care, evaluation, diagnosis, or treatment of a specific patient"), Midland contends that Dr. Osunero did take two affirmative actions to participate in Castellanos' care before 8:36 p.m. Resp. at 9 (*Mackey*, 35 N.E.3d at 638 (emphasis added)). Midland argues that Dr. Osunero (1) "prepared and signed the affirmation of the attending anesthesiologist to form the basis for documentary proof of informed consent" and (2) "signed a pre-anesthesia evaluation form timed in his own handwriting at 8:00 p.m." Resp. at 10 (citing PSOF

---

[6]Resp. at 12–15 (citing *Lownsbury v. VanBuren*, 762 N.E.2d 354 (Ohio 2002); *Mozingo by Thomas v. Pitt Cty. Mem'l Hosp., Inc.*, 415 S.E.2d 341 (N.C. 1992)).

¶¶ 8–9).[7] The Consent (which on its face, shows Castellanos' consent to undergo a Cesarean section) does indeed contain Dr. Osunero's signature at the bottom, but there does not appear to be a timestamp. As such, this form is not particularly helpful in determining whether a physician-patient relationship was formed prior to 8:36 p.m.

The Anesthesiology Preoperative Evaluation Form, however, does include Dr. Osunero's signature with a 8:00 p.m. timestamp. *See* Anesthesiology Preoperative Evaluation Form. Midland argues that based on the face of the form, the medical record indicates that Dr. Osunero was first aware of Castellanos at 8:00 p.m. when he completed a pre-anesthesia assessment. Resp. at 4. The face of the medical record, then, appears to create a question of fact as to when/if Dr. Osunero participated in a pre-anesthesia evaluation.

Challenging Midland's contention of a disputed fact in reply, Dr. Osunero argues that Midland is "taking a myopic view" of the Anesthesiology Preoperative Evaluation Form, which "misrepresents the facts surrounding the surgical case in an effort to alter the timeline of Dr. Osunero's involvement in Julia Castellanos' care." R. 74, Reply at 3. Dr. Osunero, citing no case law, further argues that "[e]xamination of all the evidence, as required by a motion for summary judgment, demonstrates that there is no issue of fact as to when Dr. Osunero was notified of Julia Castellanos or

---

[7]Midland adds that these documents show another example of Dr. Osunero's negligence in that he signed documents related to Castellanos' care without (per his testimony) actually evaluating her. Resp. at 10. The Court disregards this negligence argument, as the issue in dispute here is whether Dr. Osunero had a patient-physician relationship with Castellanos, not whether he acted negligently in completing hospital forms.

became involved in her care." *Id*. at 4. Dr. Osunero points to specific testimony that contradicts the 8:00 p.m. timestamp: (i) he testified that he signed the Anesthesiology Preoperative Evaluation Form *after* he was first paged at 8:36 p.m. and included 8:00 p.m. next to his signature because Kammann had examined Castellanos at 8:00 p.m., and (ii) Kammann testified that she performed the pre-anesthesia evaluation without Dr. Osunero present. *Id*. (citing Osunero Dep. at 142:16–147:18; Kammann Dep. at 66:8–19). Dr. Osunero argues that Midland's assertion of a question of fact as to the Anesthesiology Preoperative Evaluation Form "asks this Court to view [the form] in a vacuum that ignores the medical testimony in the case." *Id*.

Of course, in asking the Court not to ignore certain medical testimony to determine whether facts are in dispute, Dr. Osunero is, at the same time, asking the Court to ignore certain documentary evidence proffered by Midland. The Anesthesiology Preoperative Evaluation Form, on its face, shows Dr. Osunero signed a form related to Castellanos' care at 8:00 p.m. While Dr. Osunero proffers an explanation for his signature on the form, the Court cannot ignore this evidence. The Court cannot weigh conflicting evidence or make credibility determinations at the summary judgment stage, meaning that the Court cannot, as Dr. Osunero suggests, find the deposition testimony more credible than a medical record. *Omnicare*, 629 F.3d at 704. Those tasks are reserved for the jury. *Id*. at 704–705. As such, the Court, in viewing the evidence in the light most favorable to Midland, as it must, finds that there are indeed questions of fact as to when Dr. Osunero signed the Anesthesia

Preoperative Evaluation Form and when/if Dr. Osunero participated in a pre-anesthesia evaluation of Castellanos. *Scott*, 550 U.S. at 378.

The summary judgment inquiry does not end there, however. The pertinent question now becomes: is this disputed fact *material* to the physician-patient analysis? *See Egan v. Freedom Bank*, 659 F.3d 639, 643 (7th Cir. 2011) (citing *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994) (In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial.")); *First Ind. Bank v. Baker,* 957 F.2d 506, 508 (7th Cir. 1992) (noting that disputed facts are "material" if they might affect the outcome of the suit).

Notably, neither party meaningfully addresses the materiality question. Dr. Osunero could have, for example, argued that even *if* he signed the form and participated in the pre-anesthesia evaluation at 8:00 p.m., that participation would not have created a special relationship and is not material to the patient-physician relationship determination. Although Dr. Osunero does not engage in this analysis, the Court cannot follow suit. On its face, the Anesthesiology Preoperative Evaluation Form includes Castellanos' preoperative diagnosis, identifying information, and vitals; details the type of anesthetic plan being administered; and is signed and dated by Dr. Osunero. *See* Anesthesiology Preoperative Evaluation Form. Weighing the testimony of Dr. Osunero and Kammann against the face of this document, a reasonable jury could find the testimony credible and find that Dr. Osunero did not

sign the form at or around 8:00 p.m and did not participate in Castellanos' pre-anesthesia evaluation. On the other hand, a reasonable jury could find Dr. Osunero's deposition testimony not credible and could find instead that at 8:00 p.m., Dr. Osunero signed the form, was informed of Castellanos' condition, and offered medical advice to administer general anesthesia. A reasonable jury could further find that Dr. Osunero, as the on-call attending anesthesiologist, was assigned to advise on cases requiring anesthesia services pursuant to a contract; was compensated for his services; and by participating in a pre-anesthesia evaluation, was consulted for the benefit of Castellanos, received specific information regarding her symptoms and test results, and recommended the use of general anesthesia. The Court notes that such findings of fact could support a finding of a special relationship under the *Mackey* framework and decide the outcome of the case as to Dr. Osunero's conduct before 8:36 p.m. Finding a genuine issue of material fact as to whether Dr. Osunero participated in a pre-anesthesia evaluation at 8:00 p.m. precludes summary judgment on the duty of care issue. *Jones v. O'Brien Tire & Battery Serv. Ctr., Inc.*, 871 N.E.2d 98, 112 (2007) ("Ordinarily, the existence of a duty is a question of law to be determined by the court," but where "the existence of a duty is dependent on disputed facts, however, the existence of the relevant facts is a question for a trier of fact to resolve."). As such, Dr. Osunero's motion for summary judgment as to his conduct before 8:36 p.m. is denied.[8] *Daum v. Staffing Network, L.L.C.*, 2002 WL 31572557, at *3 (N.D. Ill. Nov.

---

[8]The Court notes that Dr. Osunero, in his Reply, briefly argues for the first time that his conduct before 8:36 p.m. (namely, that he failed to communicate with Kammann) also could not have proximately caused Castellanos' injuries or death. Reply at 11. Dr. Osunero

19, 2002) (finding that sworn deposition testimony and the EEOC submissions contradicted each other as to when the alleged discrimination occurred and accordingly denying summary judgment on the ADA count).

## II.   Whether Dr. Osunero's Conduct After 8:36 p.m. Proximately Caused Castellanos' Injuries and Death

Dr. Downs levels one criticism at Dr. Osunero after he was paged—that Dr. Osunero delayed in reintubating Castellanos. Mot. Summ J. Memo. at 7 (citing Downs Dep. at 103:22–104:11). Dr. Osunero moves for summary judgment as to this claimed intubation delay, arguing that his actions at that point did not cause or contribute to cause Castellanos' alleged injuries and ultimate death. Mot. Summ. J. Memo. at 7. Essentially, Dr. Osunero argues that the damage was done before he was asked to assist in the operating room. *Id*.

While the issue of proximate cause is ordinarily a question of fact for the jury (*Townsend v. Univ. of Chi. Hosps.,* 861 N.E.2d 1055, 1058 (Ill. App. Ct. 2001)), at the summary judgment stage, the plaintiff must present affirmative evidence that the defendant's negligence was arguably the proximate cause of the plaintiff's injuries (*Hussung v. Patel,* 861 N.E.2d 678, 684 (Ill. App. Ct. 2007)). If the plaintiff fails to do so, summary judgment is proper as a matter of law. *Id*. at 685. Proximate cause must be established by expert testimony to a reasonable degree of medical certainty. *Susnis v. Radfar,* 739 N.E.2d 960, 967 (Ill. App. Ct. 2000). The

---

presumably added this argument in the alternative should his argument regarding duty of care fail. The Court does not consider this untimely argument in deciding summary judgment here. *Dyson, Inc. v. Sharkninja Operating LLC*, 2016 WL 4720019, at *1 (N.D. Ill. Sept. 9, 2016) ("Arguments raised for the first time in a reply brief are waived.") (citing *U.S. v. Kennedy*, 726 F.3d 968, 974 n.4 (7th Cir. 2013)).

causal connection between treatment, or a delay and treatment, and the claimed injury "must not be contingent, speculative, or merely possible." *Aguilera v. Mount Sinai Hosp. Med. Ctr.,* 691 N.E.2d 1, 7 (Ill. App. Ct. 1998). An expert's opinion is only as valid as the reasons for the opinion. *Petraski v. Thedos,* 887 N.E.2d 24, 28 (Ill. App. Ct. 2008). While testimony grounded in "expert analysis of the known physical facts" is welcomed, conclusory opinions based on sheer, unsubstantiated speculation should be considered irrelevant. *Id.* at 31.

Dr. Osunero argues that summary judgment should be granted as to proximate cause in connection with his post-8:36 p.m. conduct for three reasons. *See* Mot. Summ. J. Memo. at 8–9. First, Dr. Osunero contends that Dr. Downs' opinion regarding a delay in reintubation should be rejected, because it constitutes "impermissible speculation." *Id.* at 8. Second, Dr. Osunero argues that Dr. Downs' speculative opinion should be considered irrelevant, because it runs contrary to the testimony of every individual in the operating room. *Id.* at 8–9. Third, Dr. Osunero maintains that his actions after being paged bear no causal relation to the alleged injuries. *Id.* at 9–10. The Court addresses each argument in turn.

Dr. Osunero contends that Dr. Downs' opinion regarding a delay in reintubation is based on "sheer, unsubstantiated speculation," because "there has been no correlation between the photographs taken by Dr. Osunero after the procedure and the actual, exact timing of events that transpired in the operating room." Mot. Summ. J. Memo. at 8. As such, Dr. Osunero asserts that there is no

22

evidence of any delay. *Id.* (citing *Wiedenbeck v. Searle*, 895 N.E.2d 1067, 1075 (Ill. App. Ct. 2008)).

In *Wiedenbeck*, an urgent care doctor failed to order a CT scan when he saw the patient two days before she died of a brain herniation. 895 N.E.2d at 1068. In affirming the trial court's grant of the defendant's motion for summary judgment, the appellate court found that the plaintiff had failed to offer expert evidence to a reasonable degree of medical certainty that the defendant-doctor's failure to order a CT scan caused the plaintiff's injuries. *Id.* at 1074. Importantly, and not mentioned by Dr. Osunero, the court made this determination based on the plaintiff's expert's testimony during cross-examination that it would only be "pure speculation" to state that an earlier CT scan would have shown the necessity of earlier intervention *Id.* at 1075. In fact, when asked about causation, the plaintiff's expert only said that treatment "would have been sooner, and sooner would have been better." *Id.* Based on this speculative evidence, the court explained that the "mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate causation." *Id.* (quoting *Susnis,* 739 N.E.2d at 967)

Here, the Court finds that Midland has offered more than "pure speculation." Indeed, Dr. Downs opined that the Osunero Photographs (namely, the minute-by-minute trends showing the vital statistics of Castellanos as recorded on the anesthesia monitor) showed no oxygenation recorded, no blood pressure recorded, and no end-tidal $CO_2$ or gas exchange (which would have occurred within a matter of a breath or two of successful reintubation) at 8:44 p.m., which arguably contradicts Dr.

Osunero's estimates of arrival time and reintubation time. PSOF ¶¶ 18, 22–23. Dr. Downs further opined that the first objective evidence of a successful reintubation was at 8:50 p.m. when the patient recorded a SP02 level of 43, a blood pressure of 121/61, respiration rate of 18, end-tidal CO2 of 23, and an end-tidal oxygen and inspired oxygen differential of 85/94. *Id.* ¶ 23. Dr. Downs stated these recorded vital signs demonstrate an unreasonably delayed reintubation of at least seven minutes, and perhaps as many as ten minutes when the negative effects of Castellanos having suffered a cardiac arrest at 8:39 p.m. could have been reversed or minimized. *Id.* ¶¶ 18, 22–24. Based on training, experience, and review of the Osunero Photographs, Dr. Downs concluded, to a degree of medical certainty, that there was a direct causal relationship between this unreasonable delay and Castellanos' injuries. Downs Dep. at 175:18–22 ("She suffered cardiac arrest, secondary to severe arterial hypoxemia, and then due to the delay in resuscitation, irreversible and severe brain injury, all of which then led to coagulopathy, renal failure, liver failure, multi-system organ failure, and ultimately death."). This is more than speculation.

As for Dr. Osunero's contention that there has been no correlation between the Osunero Photographs and the actual, exact timing of events that transpired in the operating room, the Court finds this contention to be a challenge of Dr. Downs' opinions and interpretations rather than an admissibility/relevance argument. Dr. Downs testified that the Osunero Photographs are the most reliable medical information about Castellanos' vital signs and status during the operative procedure, because the anesthesia record and its addendum are unreliable, and in some

instances unintelligible. Downs Dep. at 106:18–107:16. Dr. Osunero is free to challenge that opinion at trial but not at summary judgment.

Next, Dr. Osunero argues that Dr. Downs' opinions should also be rejected, because they are contrary to the testimony of every individual in the operating room. Mot. Summ. J. Memo. at 8–9. The Court also finds this argument unpersuasive. The fact that an expert's opinion contradicts other witnesses' testimony does not render the expert opinion inadmissible. Moreover, this argument goes to weight of conflicting evidence and should not be decided at summary judgment. *Omnicare*, 629 F.3d at 704.

Finally, alternatively accepting Dr. Downs' testimony as admissible and relevant, Dr. Osunero maintains that his actions after 8:36 p.m. bear no causal relation to Castellanos' injuries. Mot. Summ. J. Memo. at 9–10. Dr. Osunero insists that Dr. Downs testified that Castellanos had already suffered cardiac arrest secondary to severe arterial hypoxemia and likely brain damage before he was ever paged. *Id.* at 10. But Dr. Osunero mischaracterizes Dr. Downs' testimony here. Dr. Downs actually testified that Castellanos "suffered cardiac arrest, secondary to severe arterial hypoxemia, and *then due to the delay in resuscitation*, irreversible and severe brain injury." Downs Dep. at 175:18–22.[9]

---

[9]For the first time in his Reply, Dr. Osunero makes one final argument regarding causation. Reply at 14. He notes that Dr. Downs opined that he would have had to arrive in the operating room five minutes earlier in order to change the outcome in the present case. *Id.* at 14 (citing Downs Dep. at 69:12–19). Dr. Osunero contends that he did not have a patient-physician relationship with Castellanos five minutes before his arrival in the operating room, and as such, he owed no duty of care to Castellanos at that time. Reply at 14. Because this Opinion finds that there is a material question of fact with regard to the existence of a patient-

The Court finds Dr. Osunero's arguments regarding causation to be unpersuasive and further finds that Midland has presented affirmative evidence that Dr. Osunero's negligence was arguably the proximate cause of Castellanos' injuries. Dr. Osunero is, of course, free to challenge Dr. Downs' conclusions at trial or to present evidence that it would have been impossible for him to intubate earlier than he did, or that an earlier intubation would have made no difference. Dr. Osunero has not established the absence of a material dispute, however. As such, Dr. Osunero's motion for summary judgment as to his conduct after he was paged is also denied.

## Conclusion

For the reasons given above, Dr. Osunero's Motion for Summary Judgment [60] is denied. By April 9, 2021, the parties shall file a joint status report stating (1) whether the parties would like a settlement conference with the Magistrate Judge, (2) whether the parties consent to proceeding with trial before the Magistrate Judge, and (3) whether the parties agree to a bench trial, and, if so, whether the parties agree to a virtual bench trial.

Dated: March 29, 2021

_____
United States District Judge
Franklin U. Valderrama

---

physician relationship before 8:36 p.m., Dr. Osunero cannot prevail on this argument at summary judgment.